Filed 8/19/14  Smeed v. Galtar, LLC CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| J.R. SMEED,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>GALTAR, LLC et al.,<br><br>     Defendants and Appellants. | F067110<br><br>(Super. Ct. No. S-1500-CV-270444)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Sidney P. Chapin, Judge.

Noriega & Associates, Noriega & Oldaker and Donald C. Oldaker for Defendants and Appellants.

LeBeau-Thelen, Bob H. Joyce and Andrew K. Sheffield for Plaintiff and Respondent.

-ooOoo-

Defendant, Galtar, LLC (Galtar) brought an action against plaintiff for breach of contract and misrepresentation, arising out of a contract for the purchase of certain real property from plaintiff.  Galtar voluntarily dismissed the action prior to trial.  Plaintiff then sued Galtar and its sole member for malicious prosecution.  After a court trial, judgment was entered in favor of plaintiff, awarding compensatory damages for the

attorney fees plaintiff incurred in the underlying action and punitive damages; it also awarded plaintiff his attorney fees in the malicious prosecution action as recoverable costs. Defendants appeal, challenging the judgment and the award of attorney fees as costs. We reverse and remand, with directions to the trial court to redetermine the compensatory and punitive damages and to strike the award of attorney fees as costs.

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2006, Robert Ford introduced defendant, Ghassan Merhi, manager and sole member of Galtar, to plaintiff J.R. Smeed. Ford and Smeed had been negotiating an agreement by which Smeed would sell and Ford or his company, Nightingale, LLC, would purchase 1,942 acres of real property in the Tehachapi area. Ford sought to assign his interest in the transaction to Galtar, which would become the buyer; Galtar agreed that, when the property was later sold, Ford would share in the profits. The parties, through attorneys, negotiated and entered into a written contract which differed from the agreement contemplated by the Ford-Smeed transaction. The Galtar-Smeed contract contemplated the sale of all the parcels of property in Spring Creek Estates and Section 27, and all of the parcels in Montclair Estates then owned by Smeed or by Spring Creek Estates, Inc., the corporation to which Smeed transferred most of the parcels that were to be sold to Galtar. The contract did not include property in Pine Ridge Estates, which had been included in the Ford-Smeed transaction.

Before the Galtar-Smeed contract was signed, Merhi was notified that the acreage involved in the transaction was 1,856 acres; later, the number was reduced to 1,786 acres. On May 30, 2006, Robert Brumfield, an attorney who was participating in the negotiation and drafting of the contract on behalf of Ford and Galtar, inquired of Smeed's attorney, Michael Stump, why the acreage had been reduced. Stump's response indicated he had spoken with Smeed and Smeed said he had had approximately 1,900 acres 18 months before, but in the interim he had sold the difference; Smeed indicated the preliminary title

2

report contained all the properties that were the subject of the deal. In the contract, which was dated May 31, 2006, Smeed expressly represented that the acreage was 1,768 acres. Although the contract stated the property being sold was described in an attached exhibit A, apparently no exhibit A was ever attached to the contract. The contract also provided for the transfer to Galtar of specified heavy equipment and "all records and other supplies needed to operate the [Quail Valley] Water District."

In a June 1, 2006, e-mail, Galtar asked the escrow company to confirm the number of parcels and total acreage included in the preliminary report. The escrow company responded that there were 57 parcels, with a total acreage of 1696.63 acres. On the same date, Merhi, through a representative, asked Brumfield by e-mail what he thought should be done about the reduced acreage. Brumfield indicated they could suggest a price reduction, "[o]r, maybe better, get everything signed and then confront Smeed with it? I sort of like that approach because the agreement says he is selling 1,786 [*sic*] or more acres, so we get him in a bit of a bind if it's less." The representative responded that Merhi agreed they should get everything signed and then confront Smeed.

On or about June 1, 2006, Merhi signed the contract on behalf of Galtar; on or about June 8, 2006, Smeed signed the contract on behalf of himself and Spring Creek Estates, Inc. Escrow closed on July 26, 2006. After close of escrow, based on information obtained from others and adding up the acreage transferred, Galtar began to believe some of the parcels of property that should have been conveyed to it at close of escrow had not been conveyed. In December, 2006, Brumfield prepared a complaint for breach of contract on behalf of Galtar; it alleged Smeed agreed to sell 1,768 acres, but only transferred 1696 acres. Brumfield and Galtar mutually agreed to end Brumfield's representation of Galtar, and the complaint was never filed.

In April 2008, Galtar retained attorney Robert Brenner to represent it in an action against Smeed and Spring Creek Estates, Inc. Galtar complained to Brenner that it had

3

not received all the real property promised, the heavy equipment, or control of the Quail Valley Water District. Galtar provided documents in its possession concerning the transaction to Brenner. Brenner testified there were material documents and information not provided to him by Galtar. Brenner conducted his own investigation to determine whether Galtar had received all the parcels or acreage to which it was entitled under the contract. By that time, Commonwealth Land Title Company, the escrow company that handled the Galtar-Smeed sale, was out of business and only an incomplete escrow file was available. Brenner concluded only 1,641 acres had been conveyed. Although the contract attached to the complaint provided for transfer of "approx. 1768 acres more or less (more or less not to exceed 5-6 acres)," the body of the complaint Brenner prepared and filed alleged the contract obligated Smeed to convey 1,942 acres, but Smeed conveyed only 1,641 acres. The complaint alleged Smeed was also obligated to transfer to Galtar certain heavy equipment and the Quail Valley Water District, with five seats on its board, but he failed to do so. The complaint included three causes of action for intentional and negligent misrepresentation and rescission of the contract for fraud, all based on allegations that Smeed falsely represented to Galtar on or about May 31, 2006, that the acreage to be transferred was 1,942 acres, and that the heavy equipment and water district would also be transferred.

After Brenner began to have health issues, Galtar substituted the Wolf firm in as its attorneys in the *Galtar v. Smeed* action.[1] Brenner sent his case file to the Wolf firm. After reviewing Brenner's file, an attorney from the Wolf firm advised Merhi the case had been mishandled, and it would be difficult and expensive to win. Because of the mishandling and the expense of pursuing the action, he recommended Galtar dismiss the action against Smeed without prejudice. Galtar voluntarily dismissed the action without

---

[1]     *Galtar v. Smeed,* Superior Court Kern County (2012) No. S-1500-CV-267312.

4

prejudice. Smeed did not move for an award of attorney fees as the prevailing party, although the contract contained an attorney fee provision.

Approximately a month later, Smeed filed this malicious prosecution action against Galtar and Merhi, alleging the *Galtar v. Smeed, supra,* action was filed without probable cause because the contract in the Galtar-Smeed transaction was fully integrated and did not provide for the sale of 1,942 acres or the delivery of the water district. The complaint further alleged the escrow officer informed Galtar and Merhi on June 1, 2006, that the property subject to the contract consisted of 1,696 acres, not 1,942 acres; further, defendants received and sold the heavy equipment before the underlying complaint was filed. Plaintiff alleged the underlying action was filed and maintained with malice, to extort money from plaintiff. The malicious prosecution action was tried before the court and resulted in a judgment in favor of Smeed; the trial court awarded Smeed compensatory damages of $28,074.82, consisting of Smeed's attorney fees in the underlying action, punitive damages of $100,000, prejudgment interest, and $217,590 in attorney fees incurred in the malicious prosecution action, awarded as costs. Defendants appeal from the judgment and the order awarding attorney fees as costs.

## DISCUSSION

### I.      Standard of Review

"To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations]." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 (*Bertero*).) "The plaintiff in a malicious prosecution action must prove each of the necessary elements of the tort." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164 (*Sangster*).) Favorable termination and lack of probable cause are questions of law,

5

which we review de novo, unless there is a dispute as to the facts on which the determination depends. (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149, 1154.) Any such factual issues are threshold questions that must be determined by the trier of fact before the court may reach the legal issue; factual issues are reviewed for substantial evidence. (*Id*. at p. 1154; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 868.) Malice is also a question of fact, subject to substantial evidence review. (*Sheldon Appel Co., supra*, at p. 875.)

"""An order granting or denying an award of attorney fees is generally reviewed under an abuse of discretion standard of review; however, the "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law." [Citations.]"" [Citation.] An issue of law concerning entitlement to attorney fees is reviewed de novo. [Citations.] 'When a trial court has resolved a disputed factual issue, an appellate court reviews the ruling according to the substantial evidence rule.'" (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

## II.     Elements of Malicious Prosecution

### A.     *Commencement by defendants*

There was no dispute the underlying action was commenced by or at the direction of defendants. Galtar and Merhi do not contend this element of the cause of action was not established.

### B.     *Termination in favor of plaintiff*

In order for the termination of a lawsuit to be considered favorable for purposes of a subsequent malicious prosecution action, "the termination must reflect on the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit." (*Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1056 (*Contemporary Services*).) "'Where a proceeding is terminated other than on its merits, the reasons underlying the termination must be examined to see if it reflects the opinion

6

of either the court or the prosecuting party that the action would not succeed. [Citations.].' [Citation.]" (*Oprian v. Goldrich, Kest & Associates* (1990) 220 Cal.App.3d 337, 343 (*Oprian*).) "[A] voluntary dismissal, even one without prejudice, may be a favorable termination which will support an action for malicious prosecution. [Citation.] 'In most cases, a voluntary unilateral dismissal is considered a termination in favor of the defendant in the underlying action.'" (*Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808.) A dismissal for failure to prosecute or after a failure to cooperate in discovery may constitute a dismissal on the merits and a favorable termination of the action. (*Weaver v. Superior Court* (1979) 95 Cal.App.3d 166, 185 (*Weaver*); *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400-1401 (*Sycamore Ridge*).) A dismissal due to settlement or a dismissal on technical grounds for procedural reasons does not constitute a favorable termination. (*Ibid*.; *Oprian*, *supra*, 220 Cal.App.3d at p. 343.)

Smeed asserts Galtar's dismissal of the underlying action was presumed to be a favorable termination on the merits. *Sycamore Ridge, supra,* 157 Cal.App.3d 1385 asserts "[a] voluntary dismissal is presumed to be a favorable termination on the merits, unless otherwise proved to a jury," (*id.* at p. 1400) based on """"the natural assumption that one does not simply abandon a meritorious action once instituted."" [Citation.]" (*Ibid.*) *Sycamore Ridge* and the case on which it relied, *Weaver*, indicated that, in determining whether a dismissal was a termination favorable to the malicious prosecution plaintiff, when conflicting evidence about the circumstances surrounding the dismissal is presented, the reason for the dismissal is a question of fact for the trier of fact to resolve. (*Id.* at pp. 1400-1401; *Weaver*, *supra*, 95 Cal.App.3d at pp. 185-186.) We interpret these cases as establishing a presumption affecting the burden of producing evidence. Such a presumption "implement[s] no public policy other than to facilitate the determination of the particular action in which the presumption is applied." (Evid. Code, § 603.) Its effect

7

"is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604.) The presumption "is not evidence but merely an assumption designed solely to help the trier of fact reach a determination." (*Estate of Trikha* (2013) 219 Cal.App.4th 791, 802.) "Thus, the presumption exists 'unless and until evidence is introduced which would support a finding of its nonexistence.' [Citations.] '[W]hen the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question.' [Citations.]" (*Id.* at p. 803.) Thus, if the malicious prosecution defendant presents evidence that the dismissal was not on the merits, the trier of fact must determine the reasons for the dismissal.

A dismissal for economic reasons, not related to the merits of the case, does not constitute a favorable termination. (*Oprian*, *supra*, 220 Cal.App.3d at pp. 343-345; *Contemporary Services*, *supra*, 152 Cal.App.4th at p. 1057.) In *Oprian*, Stern sued Oprian, and Oprian cross-complained against Stern and his company, Goldrich, Kest and Associates (GKA). Stern settled one cause of action with a third party and dismissed it; Oprian prevailed at trial on the other causes of action and the cross-complaint. Stern and GKA appealed; at oral argument, the appellate court asked whether Stern would retry the complaint if it reversed the judgment on the cross-complaint; counsel responded that his clients "would probably be willing to forego further prosecution of the complaint rather than incur additional attorney's fees and the inconvenience of pursuing a second trial." (*Oprian*, *supra*, 220 Cal.App.3d at p. 342.) The appellate court reversed the judgment for Oprian on the cross-complaint and directed that the complaint be dismissed, based on the

8

representations of counsel at oral argument. Oprian then filed its malicious prosecution complaint against Stern, GKA, and the attorneys who represented them in the underlying action. The trial court granted the defendants' motion for summary judgment, on the grounds the termination was not favorable to the plaintiff and the defendants had probable cause to bring their action. (*Ibid.*)

The appellate court affirmed the judgment, concluding there was no favorable termination of the underlying action as a matter of law. (*Oprian*, *supra*, 220 Cal.App.3d at p. 343.) One cause of action was terminated by settlement; the other was dismissed by the court of appeal based on representations that it would not be pursued for economic reasons. The latter did not reflect the opinion of the court that the defendants' claim would not succeed on retrial. (*Id*. at p. 344.) "It would be a sad day indeed if a litigant and his or her attorney could not dismiss an action to avoid further fees and costs, simply because they were fearful such a dismissal would result in a malicious prosecution action. It is common knowledge that costs of litigation, such as attorney's fees, costs of expert witnesses, and other expenses, have become staggering. The law favors the resolution of disputes. 'This policy would be ill-served by a rule which would virtually compel the plaintiff to continue his litigation in order to place himself in the best posture for defense of a malicious prosecution action.' [Citation.]" (*Id*. at pp. 344-345.) The dismissal was not on the merits and did not establish that the underlying action was terminated in Oprian's favor. (*Id*. at p. 345.)

In *Contemporary Services*, Contemporary Services Corporation (CSC) filed an action against Staff Pro; a few years later, Staff Pro filed an action against CSC, and CSC cross-complained against Staff Pro. (*Contemporary Services, supra,* 152 Cal.App.4th at pp. 1047-1048.) Both actions were set for trial the same day. The first action could not be continued because it was approaching the five-year deadline for bringing the case to trial under Code of Civil Procedure section 583.310. Substantial discovery was still

needed for the second action.  Staff Pro did not have the financial resources to prepare for both actions at the same time.  Accordingly, it dismissed the second action without prejudice in order to concentrate on the first.  (*Contemporary Services,* at p. 1049.)  At the time, both Staff Pro's president and its attorney believed the second action was valid.  (*Ibid.*)  CSC filed a malicious prosecution action based on the dismissed action.  (*Id.* at pp. 1050-1051.)  In response, Staff Pro filed an anti-SLAPP motion to strike (Code Civ. Proc., § 425.16), which was granted, and CSC appealed.  The court affirmed, concluding CSC failed to show a likelihood it would prevail on the merits of its malicious prosecution cause of action, because it could not establish a favorable termination on the merits of the underlying action.

The court reviewed the dismissal to determine whether it reflected CSC's innocence of the misconduct alleged in the underlying complaint.  "[T]he record shows defendants could not afford to pursue the matter, not that they lost faith in the merit of their claims.  The record does not show defendants sustained any adverse rulings in the case, or otherwise had reason to believe their claims would be unsuccessful." (*Contemporary Services*, *supra*, 152 Cal.App.4th at p. 1057.)  The court rejected CSC's argument that Staff Pro dismissed in order to avoid the deposition of its president, which it contended would reveal Staff Pro's claims lacked merit.  (*Ibid.*)  There was evidence, including the declaration of his physician, that the deposition was postponed because Staff Pro's president had the flu.  (*Id.* at pp. 1057-1058.)

Here, Galtar contends it dismissed the underlying action for economic reasons.  The communications with its attorneys, however, reflect serious concerns about Galtar's ability to prevail in the underlying action.  In an e-mail sent approximately one month before the dismissal, an attorney from the Wolf firm stated:

> "The news is not good.  As we discussed the case was materially
> mishandled by prior counsel and we are now facing new discovery, a
> summary judgment motion and if we can overcome that motion a trial date

on a case that has substantial hurdles.  The problem at this point is that based on the way the case has been handled up to this point by prior counsel and the present posture of the case we have no leverage.  To gain leverage we would need at a minimum to respond to the discovery and overcome the summary judgment motion.  It will be costly to do this and we cannot guaranty that it would result in a resolution of the case or that we could prevail on the summary judgment motion or at trial if a determination was made to move forward.  [¶] … [¶] We are certainly prepared to go forward with the case but … we are concerned that the fees in doing so will be substantial .…"

In a subsequent e-mail, another attorney from that firm opined that prior counsel did not allege the right causes of action in the right way and failed to respond to discovery, including failing to produce the person most knowledgeable for a properly noticed deposition.  He was concerned that Galtar might be precluded from presenting witnesses at trial because of its failure to answer interrogatories or submit to deposition. He noted that the prior attorney indicated "he proceeded as he did because he was instructed to just settle the case."

Although the attorneys were concerned about the economics of proceeding with the case, they also expressed substantive concern about the validity of the causes of action as alleged and about Galtar's ability to prevail on the merits.  In its statement of decision, the trial court stated:  "The motive for the dismissal is evidenced in exhibit [No.] 113,[2] and is considered in light of the intent of Galtar to originally seek settlement of the case for payment to Galtar of $500,000.…  The documents clearly reflect an opinion of Galtar's representatives that the action would not succeed.  The voluntary dismissal is presumed to be a termination on the merits.  Galtar's attempted explanation does not overcome the assumption that a plaintiff does not simply abandon a meritorious action once instituted."  (Unnecessary capitalization omitted.)  Thus, unlike the situations in *Oprian* and *Contemporary Services*, where the evidence indicated the dismissing party had not lost faith in the merits of the claims, but dismissed due to financial

---

**2**    Exhibit No. 113 included the two e-mails to Galtar from the Wolf firm, discussed above.

considerations, the trial court here found the dismissal "'reflect[ed] the opinion of … the prosecuting party that the action would not succeed. [Citations.]' [Citation.]" (*Oprian*, *supra*, 220 Cal.App.3d at p. 343.) Substantial evidence supports that factual finding. Accordingly, we conclude the element of termination in favor of Smeed was established.

### C.    *Lack of probable cause*

#### 1.    **Breach of contract cause of action**

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him. In making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. [Citation.] In all cases, probable cause is to be determined by an objective standard. If any reasonable attorney would have thought the claim made in the prior action tenable, then it is not lacking in probable cause and the defendant is entitled to judgment in the malicious prosecution action regardless of what the defendant's subjective belief or intent may have been. [Citations.]" (*Sangster, supra*, 68 Cal.App.4th at pp. 164-165, fn. omitted.)

The second cause of action in the underlying complaint alleged breach of contract. The elements of a cause of action for breach of contract are: "'(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' [Citation.]" (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 921.) Galtar's complaint alleged the parties entered into a written contract on May 31, 2006, for the sale of real property known as Spring Creek Estates, Montclair Estates, and Section 27 in Tehachapi, and Smeed and Spring Creek

Estates, Inc., "were transferring the Quail Valley Water District to [Galtar] with 5 seats on the board, and all personal property on the land, including, but not limited to, CAT 416 Backhoe, CAT D-8-H Dozer, CAT 12-E Blade, Trencher (broken down), pipes and supplies in Warehouse, Kenworth Tractor, Dump Truck, plus all the records and other supplies needed to run the Water District." The contract was attached to the complaint as an exhibit. The breach of contract cause of action alleged Galtar fully performed under the contract, but Smeed and Spring Creek Estates, Inc. breached it "by failing to disclose that the acreage was 1641.60, not the approximately 1942 acres represented by defendants in the contract," and by failing to transfer the water district and personal property; as a result, Galtar was damaged.

Smeed contended Galtar lacked probable cause to bring the cause of action for breach of contract as alleged, because Galtar's complaint inaccurately alleged some of the terms of the contract. Smeed asserted the contract was for sale of 1,768 acres of land, not the 1,942 alleged, and the contract did not provide for transfer of the water district itself (which was a state agency), but only for the transfer of the "records and other supplies needed to operate the Water District." Smeed asserted the records and supplies for the water district and a bill of sale for the other personal property were provided to Galtar at close of escrow. Thus, there was no probable cause to believe Smeed and Spring Creek Estates, Inc. had breached the contract.

In the contract attached as exhibit A to the Galtar complaint, Smeed and Spring Creek Estates, Inc. agreed to sell and Galtar agreed to buy "approximately 1,768 acres more or less (more or less not to exceed 5-6 acres)" of real property near the city of Tehachapi, commonly known as Montclair Estates, Spring Creek Estates, and Section 27. "[T]o the extent the factual allegations [in the body of the complaint] conflict with the content of the exhibits to the complaint, we rely on and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as to the legal effect of the

13

exhibits. [Citations.]" (*Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 504-505.) Accordingly, the complaint alleged a contract for the sale and purchase of 1,768 acres of land; Smeed's and the trial court's reliance on the inconsistent allegation in the body of the complaint that the contract was for the sale of 1,942 acres is unwarranted.

Smeed asserts the Galtar-Smeed contract was "fully integrated and superseded all other contracts, negotiations and oral representations," citing section 7.8 of the contract. The parol evidence rule provides that, when the parties enter into an integrated written contract, the writing supersedes all prior negotiations, and extrinsic evidence of any prior agreement or any contemporaneous oral agreement may not be used to contradict, alter, or add to the terms of the writing. (Code Civ. Proc., § 1856, subd. (a); Civ. Code, § 1625; *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 (*Riverisland*).) "'An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.' [Citations.]" (*Riverisland,* at p. 1174.) Whether an agreement is an integration is a question of law for the court. (*Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 805.) "The central question in determining whether there has been an integration, and thus whether the parol evidence doctrine applies, is 'whether the parties intended their writing to serve as the exclusive embodiment of their agreement.' [Citation.]" (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1385-1386.)

"Although the parol evidence rule results in the exclusion of evidence, it is not a rule of evidence but one of substantive law. [Citation.] It is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement. The written terms supersede statements made during the negotiations. Extrinsic evidence of the agreement's terms is thus *irrelevant*, and cannot be relied upon. [Citation.] '[T]he parol evidence rule, unlike the statute of frauds, does not merely serve

14

an evidentiary purpose; it determines the enforceable and incontrovertible terms of an integrated written agreement.' [Citations.] The purpose of the rule is to ensure that the parties' final understanding, deliberately expressed in writing, is not subject to change. [Citation.]" (*Riverisland, supra*, 55 Cal.4th at p. 1174.)

If, as Smeed contends, the contract was fully integrated, then Smeed was obligated to convey to Galtar 1,768 acres of property as provided in the contract; no prior or contemporaneous agreement, understanding, or representation by Smeed, his attorneys, or the escrow company, could vary the terms of the writing.

At trial, the evidence concerning the amount of land conveyed was confusing. Smeed testified he sold the land by lot, not by acreage; he did not know how many acres were actually conveyed. The title company's second preliminary title report, dated May 17, 2006, was presented. On May 30, 2006, Smeed, through his attorney, represented to Galtar that this title report contained all the parcels that were the subject of the transaction. On June 1, 2006, the title company represented the land included in the preliminary title report consisted of 57 parcels and 1,696 acres. Smeed introduced a fifth updated and amended preliminary title report, dated June 29, 2006, which omitted certain parcels that had been included in the second preliminary title report.[3]

At trial, Smeed conceded he learned after close of escrow that Galtar did not receive all of the real property the parties intended he would receive in the transaction. He testified he offered to put all of the properties to be transferred to Galtar into Spring Creek Estates, Inc., then transfer the corporation to Galtar to avoid having the property reassessed for tax purposes. Galtar declined, but Smeed transferred the properties to Spring Creek Estates, Inc. anyway. Smeed understood all the property owned by Spring

---

[3]     The second and fifth preliminary title reports were the only preliminary title reports submitted; the title company was out of business and had an incomplete file for the transaction, and the parties either did not receive or did not retain copies of any other preliminary title reports.

Creek Estates, Inc. was conveyed to Galtar through escrow. In 2008, he sold Spring Creek Estates, Inc., which he believed to be a shell corporation without assets, to Robert Ford. Smeed subsequently learned that Ford sold lots in Montclair Estates, at least one of which should have been transferred to Galtar, but instead had remained in Spring Creek Estates, Inc. Ford later quitclaimed to Smeed three parcels he obtained through his purchase of Spring Creek Estates, Inc.; Smeed contended two of them were not intended to be part of the Galtar-Smeed transaction.

In September 2006, Brumfield wrote to Smeed's attorney asserting only 1,696 acres had been transferred and attaching a spreadsheet showing how the acreage was calculated. In December 2006, Galtar wrote to the title insurer, making a claim that the acreage conveyed was short 204 acres. Merhi testified Smeed subsequently conveyed to Galtar an additional four lots, totaling about 80 acres; after that, Brenner calculated Galtar only received 1641 acres. Lisa DeSantiago, who began performing services for Galtar in August 2007, testified Galtar obtained the four lots either before her employment or at the beginning of it, when another secretary was handling the matter for Galtar. DeSantiago never saw any deeds conveying the four additional parcels to Galtar. No deeds to an additional four lots were introduced at trial.

In 2008, Brenner investigated to determine whether the acreage promised was actually conveyed. He obtained the documents available from the escrow company and the lender, and had paralegals do research at the recorder's office to match the assessor's parcel numbers. His office prepared a spreadsheet identifying the lots that were transferred to Galtar; Brenner concluded the acreage transferred was 1,641.40 acres.

If the contract was fully integrated, as contended by Smeed, it required Smeed to convey to Galtar 1,768 acres of real property. The evidence, however, did not show Smeed conveyed 1,768 acres to Galtar. Rather, the evidence indicated as of May 30, 2006, Smeed had placed only 1,696 acres in escrow to be transferred to Galtar. Between

16

execution of the contract and close of escrow, some of the parcels were deleted or omitted from the preliminary title report. Some of the parcels that were intended to be conveyed to Galtar in the Galtar-Smeed transaction were not conveyed at close of escrow, but remained in Spring Creek Estates, Inc., and were transferred to Ford. Based on his independent investigation of public records and other sources, Brenner concluded only 1,641 acres had been transferred to Galtar. On these facts, we cannot say that no reasonable attorney would have thought Galtar's claim for breach of contract against Smeed was legally tenable.

The contract between Galtar and Smeed was not a fully integrated contract, however. The contract recited: "The real property subject to said purchase and sale transaction is described in the attached exhibit 'A,' and is commonly known as Montclair Estates, Spring Creek Estates, and Section 27." The definition of the term "real property" again referred to "exhibit 'A' attached hereto." The page headed exhibit A, however, states, "See pages A-1 to A-19 attached hereto," but has no pages A-1 to A-19 attached to it. The testimony indicated the parties and Galtar's attorney had not seen pages A-1 through A-19, and the pages probably were never attached to the contract. Thus, the contract indicates the parties intended to specifically describe the property that was the subject of the transaction, but the final version of the contract did not include such a description. Extrinsic evidence was admissible to determine what property was to be conveyed in the transaction.

The parties agreed the transaction included parcels in Spring Creek Estates, Montclair Estates, and Section 27, but excluded Pine Ridge Estates. Smeed testified the transaction included all the parcels in Spring Creek Estates and Section 27, and the parcels in Montclair that had not already been sold to others. Merhi testified he believed the deal initially was for all the lots in Spring Creek Estates, Montclair Estates, and Section 27; Smeed later said some of the lots in Montclair had been sold already, and he

17

could not bring them back to sell to Galtar. Thus, it was undisputed the final contract was for all of Spring Creek Estates and Section 27, and the remaining lots in Montclair Estates.

It was Galtar's position that the 19-page property description intended to be attached to the contract was the 19-page property description included in the second preliminary title report. That report was issued by the title company on May 17, 2006, shortly before the final version of the contract was prepared and signed. In an e-mail exchange on May 30, 2006, Brumfield asked Stump for "an explanation as to why the 1900 or so acres went down to 1786. If that's correct, what was sold and which parcels from the title report are not part of the deal with Galtar?" Stump responded: "I have spoken with Mr. Smeed on the acreage issue. His response is that 18 months ago there were just shy of 1900 acres. Since that time, the difference has been sold. The Preliminary Title Report provided to you (after Mr. Smeed provided it to me) contains all the properties that are the subject of the deal according to Mr. Smeed."

On June 1, 2006, in an e-mail exchange, Galtar asked for confirmation of the number of parcels and total acreage included in the preliminary report; the title company responded there were 57 parcels (rather than the 61 reflected in the second preliminary title report) and 1,696.63 acres. Both parties executed a written contract in which Smeed expressly represented the property being sold consisted of 1,768 acres, and Galtar "approve[d] the preliminary report submitted to counsel for Buyer on May 24, 2006."

The deeds did not transfer all of the parcels listed in the second preliminary title report. The deed from the Estate of Robert Martin to Galtar conveyed the parcels identified in the second preliminary title report as parcel M and parcel T, with the exception of parcel 31 of parcel map 6717, which was listed as part of parcel M. There was evidence parcel 31 of parcel map 6717 was in escrow to be sold to Sam Bassil prior to execution of the Galtar-Smeed contract and it was not intended to be part of the Galtar-

18

Smeed sale. The deed from Spring Creek Estates, Inc. conveyed the remaining parcels listed in the second preliminary title report, with the exception of parcels L, Q, S, and V. Each is described as a parcel of a specified parcel map waiver, and as a portion of a specified parcel on parcel map 6717, which was identified at trial as Montclair Estates. When asked about the parcels listed in the second preliminary title report as parcels Q and S, Smeed denied transferring any parcel map waivers. The descriptions of the parcels listed in the second preliminary title report as parcels Q, S, and V matched the descriptions of parcels Ford conveyed from Spring Creek Estates, Inc. to the Jerry R. Jacks Family Trust in August 2008, after Ford purchased Spring Creek Estates, Inc. from Smeed. Smeed conceded some parcels that were transferred by Ford to the Jerry R. Jacks Family Trust were parcels in Montclair that were not sold to others prior to the sale to Galtar. The description of the parcel listed as parcel L in the second preliminary title report matched the description of a parcel Ford quitclaimed back to Smeed after Smeed learned there were still parcels owned by Spring Creek Estates, Inc. when he sold the corporation to Ford.

The undisputed parol evidence indicated the parties agreed to the sale and purchase of all of the parcels in Spring Creek Estates and Section 27, and all of the parcels of Montclair Estates owned by Spring Creek Estates, Inc. at the time the contract was executed that were not in the process of being sold to others. Smeed conceded Ford, through his purchase of Spring Creek Estates, Inc., acquired parcels in Montclair that had not been sold to others and therefore should have been transferred to Galtar. Accordingly, we conclude plaintiff failed to establish defendants lacked probable cause to bring their breach of contract cause of action. In the absence of the essential element of lack of probable cause, the trial court erred in concluding plaintiff established that the breach of contract cause of action was maliciously prosecuted.

19

### 2. Misrepresentation causes of action

The remaining three causes of action of the underlying complaint relied on allegations of intentional or negligent misrepresentation. The elements of intentional misrepresentation are: "(1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 481.) The elements of negligent misrepresentation are: "'[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage. [Citation.]' [Citation.]" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus "'the policy of liberal construction of the pleadings ... will not ordinarily be invoked to sustain a pleading defective in any material respect.'"'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) The underlying complaint alleged that, on or about May 31, 2006, Smeed and Spring Creek Estates, Inc. falsely represented that 1,942 acres of property would be transferred to Galtar, along with the Quail Valley Water District, with five seats on the board, and specified heavy equipment. Instead, only 1641.60 acres were transferred, and the water district and heavy equipment were never transferred.

The trial court found there was no evidence to support a finding that Smeed represented the acreage to be conveyed to Galtar was 1,942 acres. That finding is supported by substantial evidence. In the contract itself, Smeed represented the acreage

20

was 1,768 acres. Merhi testified he did not speak with Smeed during May 2006. Although Merhi asserted that, at the initial meeting with Merhi, Smeed and Ford present, they discussed Merhi taking over Ford's contract to purchase 1,942 acres, Merhi admitted he knew before he signed the Galtar-Smeed contract that only 1,768 acres were to be conveyed.

The trial court also found Merhi could not have justifiably relied on a representation that Smeed was selling 1,942 acres to Galtar. Even if Smeed initially represented the transaction involved 1,942 acres, at the time Merhi signed the contract, he could not reasonably have relied on that representation, because he was aware some of the property had been sold and Smeed represented in the contract that only 1,768 acres were being conveyed.

The trial court concluded there was no probable cause to bring the claim for misrepresentation based on the failure to convey the water district. The written contract did not provide for the transfer of ownership of the water district; it provided only that "all records and other supplies needed to operate the Water District" were part of the personal property to be transferred to Galtar. Galtar and Merhi admitted in response to a request for admission that Smeed's attorney sent the records relating to the water district to Galtar prior to execution of the contract. In response to an e-mail in which Brumfield asked for written assurance that the water rights Smeed controlled, directly or indirectly, would be conveyed to Galtar, Stump responded: "Whatever Smeed has will be sold in the deal to Ford [*sic*]. Quail Valley Water District has the water rights within that 21 square miles and controls water rights.… Smeed is unable to 'convey' water rights, but they are controlled by Quail Valley Water District, a State agency, and will go with the property in the sale contemplated." Smeed testified the water district was a state agency and not something that could be transferred back and forth; it required five people on the board who knew how to run a water district. It was his intention to retain control over

21

who was placed on the board of directors until Galtar brought in suitable people. After close of escrow, Merhi suggested two people he wanted on the board; both were Nevada residents and Smeed told Merhi board members had to be California residents. Merhi did not thereafter suggest any California residents to be named to the board. Substantial evidence supports the trial court's factual findings on which it based its conclusion the misrepresentation claim arising out of the failure to convey the water district was not legally tenable. The evidence supported a finding that either Smeed did not represent the water district would be transferred to Galtar or Galtar could not reasonably have relied on such a representation because it was not included in the final contract and Galtar knew prior to execution of the contract that the water district was a state agency.

Substantial evidence also supports the trial court's finding that all of the personal property equipment that was to be transferred to Galtar "was received by or for the benefit of Galtar," so the misrepresentation claim based on failure to transfer that property was not a tenable claim. The contract required Smeed to deliver to escrow a bill of sale conveying title to the personal property to Galtar. On closing, the title company was to deliver the original bill of sale to Galtar. A copy of a bill of sale, signed by Smeed and dated May 31, 2006, was included as exhibit C to the final contract sent to Galtar. Smeed testified he believed the original bill of sale was deposited in escrow; Merhi denied receiving it from the escrow company. Smeed testified he gave the pink slips for the heavy equipment to Ford; Merhi testified Ford told him Smeed kept the equipment. There was evidence Ford, Merhi's brother, and others came to the property where the equipment was located, then later sent trucks over to remove the equipment. Invoices from August 2006 showed a towing company may have removed some of the equipment and transported it to an auction company or to other land owned by Merhi; the invoices listed Galtar as the customer and Ford as its contact person. Galtar paid the cost reflected in the invoices. Galtar's records also showed receipt of money from an auction company

22

and payment of the same sum to Ford. Substantial evidence supports the trial court's finding that the equipment "was received by or for the benefit of Galtar." Consequently, at the time Galtar filed its complaint against Smeed, it did not have probable cause to believe Smeed had misrepresented his intent to transfer the equipment to Galtar or Galtar had been damaged by a failure to transfer the equipment.

Based on its factual findings, the trial court properly concluded plaintiff established the element of lack of probable cause to bring the misrepresentation causes of action (the first, third, and fourth causes of action) of the underlying complaint.

### D.    *Malice*

Galtar does not contend the trial court erred in finding the malice element of Smeed's cause of action was established.

Thus, the trial court properly determined that plaintiff established the elements of malicious prosecution of the misrepresentation causes of action, but erred in concluding the elements were met with respect to the breach of contract cause of action.

## IV.    Reliance on Advice of Counsel Defense

"Reliance upon the advice of counsel, in good faith and after full disclosure of the facts, customarily establishes probable cause." (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1556 (*Sosinsky*).) Because it negates an element of the plaintiff's cause of action, reliance on advice of counsel is a complete defense to an action for malicious prosecution. To establish it, the defendants must "'prove that they have in good faith consulted a lawyer, have stated all the facts to him, have been advised by the lawyer that they have a good cause of action and have honestly acted upon the advice of the lawyer.' [Citations.]" (*Ibid*.) Whether the defendants made a full and fair disclosure of all the facts to the attorney is a question of fact for the trier of fact. (*Weber v. Leuschner* (1966) 240 Cal.App.2d 829, 838.)

23

The trial court concluded the defense of reliance on advice of counsel was not established, because Galtar did not make a full disclosure, in good faith, to Brenner before he filed the complaint. It found "Brenner was not fully advised concerning the history or document content, and he admitted that he would have reconsidered filing the action had he been fully advised, and would have withdrawn from representation of Galtar." Merhi and his employee, DeSantiago, testified DeSantiago sent Galtar's entire file for the Galtar-Smeed transaction to Brenner when he began his representation of Galtar. They provided additional documents when Brenner visited Galtar's office in Las Vegas. DeSantiago also sent more documents as she located them. Brenner, however, testified many documents seemed to be missing; he repeatedly asked if Galtar had any further documents.

Brenner testified Merhi told him he never received any of the heavy equipment. The trial court found "the overwhelming evidence … indicates all equipment was received by or for the benefit of Galtar." The trial court thereby rejected Merhi's testimony that he did not receive the equipment and did not know what happened to it, and credited the evidence that Smeed gave the pink slips to Ford, Ford and Merhi's brother removed the heavy equipment, Galtar paid for transportation of the equipment to auction, and the proceeds of the auction sale went into Galtar's account before being released to Ford. Galtar also did not inform Brenner that it had received the records needed to operate the water district, which were part of the equipment to be transferred pursuant to the contract. Additionally, there was evidence Galtar and Merhi failed to advise Brenner which attorneys performed work for Galtar (and arguably represented it) in the transaction; that, for a short period, Galtar leased office space from Smeed and hired an employee to work there and operate the water district; and that Galtar made a claim against the title company and received an additional 80 acres of land.

24

Further, the trial court found "Merhi did not affirmatively advise Mr. Brenner of the existence of exhibit [No.] 38, nor the fact of his telephone conversation with attorney Brumfield." Exhibit No. 38 was the exchange of e-mails in which Galtar asked for confirmation of the number of parcels and acreage to be transferred, the escrow company advised there were 57 parcels and 1,696.63 acres, the response was forwarded to Brumfield, and he suggested Galtar sign the contract and confront Smeed about the shortage of acreage later. In an excerpt from his deposition, which was read at trial, Merhi testified Brumfield advised him in an e-mail and by telephone to sign the contract and sue Smeed later for the difference. At trial, Merhi denied knowing about the e-mails in exhibit No. 38 or about the reduction of acreage below 1,768 acres prior to signing the contract.

Galtar and Merhi argue they made a sufficient disclosure by giving Brenner the documentation they had, because Brenner was able to investigate and obtain the necessary information from other sources. While it may be sufficient to provide an attorney with the contract or document about which legal advice is requested, and leave it to the attorney to review the document to learn its contents, the client is still required to disclose all relevant facts when they are necessary to a comprehensive understanding of the entire transaction about which legal advice is requested. (*Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1545-1546, fn. 8.) Substantial evidence supports the trial court's finding that Galtar and Merhi failed to adequately disclose the relevant facts to Brenner prior to the filing of the complaint in the underlying action, and therefore the reliance on advice of counsel defense was not established.

Citing Code of Civil Procedure section 634,[4] Galtar and Merhi argue: "Because Galtar timely requested a Statement of Decision asking the court to specify what had

---

[4] Code of Civil Procedure section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of

25

been withheld from Brenner, the doctrine of implied findings does not apply and the appellate court may not infer that the court made other findings favorable to its determination on this issue." We disagree. "This argument invokes the statutory rule that where a request for a statement of decision properly specifies an issue for resolution by the court, and the court fails after objection to address that issue in the statement of decision, a reviewing court 'shall not … infer[] on appeal … that the trial court decided in favor of the prevailing party as to those facts or on that issue.' [Citation.] Operation of this rule, however, is conditioned on (1) an initial request that adequately 'specif[ies]' the 'principal controverted issues' as to which the requesting party seeks a statement of decision [citation]; (2) a failure by the statement to 'resolve' the 'controverted issue' thus specified, or an ambiguity in its resolution [citation]; and (3) a record showing that 'the omission or ambiguity was brought to the attention of the trial court' [citation]." (*Yield Dynamics, Inc. v. TEA Systems Corp*. (2007) 154 Cal.App.4th 547, 558 (*Yield Dynamics*).)

Although Code of Civil Procedure section 632[5] does not define the "principal controverted issues" that must be included in the statement of decision, "it is settled that the trial court need not, in a statement [of] decision, 'address all the legal and factual issues raised by the parties.' [Citation.] It 'is required only to set out ultimate findings rather than evidentiary ones.' [Citation.] '"[U]ltimate fact[]"'" is a slippery term, but in general it refers to a core fact, such as an element of a claim or defense, without which

judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."

[5] Code of Civil Procedure section 632 provides, in relevant part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial."

the claim or defense must fail.  [Citation.]" (*Yield Dynamics, supra*, 154 Cal.App.4th at p. 559, some bracketed insertions added.)

Galtar and Merhi requested a statement of decision addressing specified matters, including:  "Whether, prior to the commencement of the prior action, Galtar and Merhi fully and fairly disclosed to Robert Brenner all of the facts and information within their knowledge relevant to the claims made in the prior action and if not, what facts or information were not disclosed."  The client's full disclosure of relevant facts to the attorney before the advice was given is an element of the defense of reliance on the advice of counsel.  (*Sosinsky*, *supra*, 6 Cal.App.4th at p. 1556.)  Thus, whether full disclosure was made was a principal controverted issue at trial.  The trial court unambiguously resolved that issue against Galtar and Merhi, finding "Brenner was not fully advised concerning the history or document content" and other matters.  The second part of Galtar and Merhi's request, asking "what facts or information were not disclosed," did not ask for resolution of a principal controverted issue or an ultimate issue of fact; it asked for evidentiary facts.  "The second part of the question, demanding "which facts support that finding," is wholly beyond the scope of the statutory procedure and warranted no response at all."  (*Yield Dynamics*, *supra*, 154 Cal.App.4th at pp. 558-559.)  Because the statement of decision resolved the controverted issue, and Galtar and Merhi have not identified any ambiguity in that resolution, Code of Civil Procedure section 634 does not apply.

## V.     Damages

"[T]he measure of compensatory damages for the malicious prosecution of a civil action includes attorney fees and court costs for defending the prior action and compensation for emotional distress, mental suffering and impairment to reputation proximately caused by the initiation and prosecution of the action."  (*Bertero*, *supra*, 13 Cal.3d at p. 59.)  Here, Smeed sought and obtained only damages measured by his

27

attorney fees in the underlying action.  Where the defendant has maliciously joined an unjustified charge with a justified charge, the plaintiff need not show that his damage was specifically attributable to the former.  (*Singleton v. Perry* (1955) 45 Cal.2d 489, 498.)  The burden of proving an apportionment between the two "must rest with the party whose malicious conduct created the problem."  (*Bertero*, at p. 60.)

The trial court concluded all causes of action of the underlying complaint were maliciously prosecuted, so it did not consider the issue of apportionment.  Because we conclude the cause of action for breach of contract was not maliciously prosecuted, we must remand for a redetermination of the damages, compensatory and punitive, that should be awarded as a result of the malicious prosecution of the remaining causes of action.

## VI.    Award of Attorney Fees as Costs

The trial court awarded Smeed his attorney fees incurred in the malicious prosecution action as recoverable costs of litigation, based on an attorney fee provision in the purchase contract.  Attorney fees are recoverable as costs when they are authorized by contract.  (Code Civ. Proc., § 1033.5, subd. (a)(10)(A).)  The Galtar-Smeed contract, section 7.1, provided:  "Should either party institute any action or proceeding to enforce or interpret this Agreement or any provision hereof, for damages by reason of any alleged breach of this Agreement or of any provision hereof, or for a declaration of rights hereunder, the prevailing party in any such action or proceeding shall be entitled to receive from the other party all costs and expenses, including actual attorneys' and other fees, incurred by the prevailing party in connection with such action or proceeding."

Whether a contract provision authorizes an award of attorney fees to a party who prevailed on a tort cause of action depends upon the language of the contractual provision.  (*Exxess Electronixx v. Heger Realty Corp.* (1988) 64 Cal.App.4th 698, 708 (*Exxess*).)  "'If a contractual attorney fee provision is phrased broadly enough, … it may

28

support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims.'" (*Ibid.*)  The ordinary rules of contract interpretation apply: "'"Under the statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation….  Such intent is to be inferred, if possible, solely from the written provisions of the contract….  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' …, controls judicial interpretation….  Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning….'" [Citation.]" (*Id.* at p. 709.)  No extrinsic evidence of the parties' intent at the time of contracting was offered.

The scope of the attorney fee provision is narrow.  The plain language authorizes a recovery of attorney fees only if a party "institute[s]" an action "to enforce or interpret" the agreement, for breach of the agreement, or "for a declaration of rights" under the agreement.  It does not broadly authorize an award of attorney fees for actions "'arising out of the execution of the agreement,'" "'"relating to the demised premises,"'" "'"relating to" the contract,'" or "'to which "this Agreement gives rise."'" (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 743-744.)  The fee provision evinces an intent that it be limited to contractual causes of action.

It has been held that a contractual provision authorizing an award of attorney fees in an action to "'enforce'" the contract or any provision of the contract does not cover attorney fees for tort claims.  (*Exxess, supra,* 64 Cal.App.4th at p. 709.)  Likewise, a provision authorizing attorney fees in an action to "'declare rights'" under the contract does not authorize an award on a tort cause of action.  (*Id.* at p. 710.)  A tort cause of action is premised on rights and duties not created by the contract; it "'redresses the

29

breach of the general duty to society which the law imposes without regard to the substance of the contractual obligation.' [Citation.]" (*Id*. at p. 711.)

We conclude the provision in the Galtar-Smeed contract authorizing attorney fees does not broadly authorize attorney fees in a tort cause of action for malicious prosecution arising out of a prior action involving the contract. Smeed's action against Galtar and Merhi was not an action "institute[d] … to enforce or interpret this Agreement …, for damages by reason of any alleged breach of this Agreement …, or for a declaration of rights" under the contract. The complaint did not contain a cause of action for damages for breach of contract or for declaratory relief. The action also was not "institute[d] … to enforce or interpret this Agreement." Smeed did not seek to compel Galtar to perform under the contract, nor did he seek an interpretation of the contract terms to enable the parties to perform, to compel specific performance, to establish a breach, or to recover damages for a breach.

The complaint alleged malicious prosecution, a cause of action designed to redress the harm sustained by an individual "because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will." (*Bertero*, *supra*, 13 Cal.3d at p. 50.) It sought recovery for the damages Smeed sustained as a result of defending against the claims pursued in the underlying action. The complaint did not combine contractual causes of action with related tort claims seeking relief for the same injuries. It alleged a subsequent, independent tort claim, for damages not connected with the breach or performance of the contract. Accordingly, we conclude Smeed's action for malicious prosecution did not fall within the coverage of the attorney fee provision in the contract.

Smeed contends Galtar and Merhi judicially admitted in their trial briefs that the attorney fee provision was broad, and they should be bound by that admission. "A

30

judicial admission is a party's unequivocal concession of the truth of the matter, and removes the matter as an issue in the case. [Citations.]" (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48 (*Gelfo*).) It is "ordinarily *a factual allegation by one party that is admitted by the opposing party*. The factual allegation is removed from the issues in the litigation because the parties *agree* as to its truth." (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452.)

The language Smeed relies on as a judicial admission was offered by Galtar and Merhi in support of their argument that Smeed waived his right to recover attorney fees incurred in the underlying action by failing to request them in that action after its dismissal. Counsel for defendants stated: "In this case, the parties interpreted the provision broadly. Prior to dismissal of the prior action, Smeed asserted that he was entitled to the full amount of his attorney's fees and costs incurred therein regardless of whether such fees were incurred defending the contract claims, or the tort claims alleged in the complaint. Galtar similarly believed that it might be exposed to payment of all of Smeed's fees and costs if it did not prevail in the prior action." (Some capitalization omitted.) First, the reference is to the position of the parties in the underlying action, about liability for attorney fees in an action alleging breach of contract and related tort claims, not about their positions on attorney fees in the subsequent malicious prosecution action. Second, there was no "unequivocal concession" that the fee provision authorized recovery of attorney fees in tort causes of action. (*Gelfo*, *supra*, 140 Cal.App.4th at p. 48.) Counsel stated "Galtar … believed that it *might* be exposed to" liability for Smeed's attorney fees, if Smeed prevailed. (Italics added.) Counsel did not concede that Galtar *would* be liable for attorney fees in the underlying action; he also did not concede that Galtar or Merhi would, or even might, be liable for Smeed's attorney fees incurred in the subsequent malicious prosecution action. Consequently, there was no unequivocal

31

concession by Galtar, Merhi, or their counsel that constituted a judicial admission and established the matter without dispute.

Because the attorney fee provision in the contract was not sufficiently broad to include attorney fees incurred in the malicious prosecution cause of action, the award of attorney fees to Smeed as costs must be reversed.

## *DISPOSITION*

The judgment is reversed and the matter remanded with directions to strike from the judgment the award of attorney fees as costs and to reconsider and determine the amount of compensatory and punitive damages to be awarded in light of our determination that the breach of contract cause of action was not maliciously prosecuted. The parties shall bear their own attorney fees and costs on appeal.

_____
HILL, P. J.

WE CONCUR:


_____
GOMES, J.


_____
KANE, J.

32